**SIGNED this 25 day of July, 2006.**

_____
LEIF M. CLARK
UNITED STATES BANKRUPTCY JUDGE

_____

# United States Bankruptcy Court

**Western District of Texas**
**San Antonio Division**

| | |
|---|---|
| IN RE | BANKR. CASE NO. |
| HUBER CONTRACTING, LTD | 04-57159-C |
| *DEBTOR* | CHAPTER 7 |

## DECISION DETERMINING LIEN PRIORITY

This is a Motion to Determine Lien Priority. The debtor in this case was a general contractor. It filed for bankruptcy on December 7, 2004. Prior to filing, a creditor attempted to garnish the debtor's bank account at Wachovia Bank, N.A., trapping some $98,750. After the filing, the trustee successfully avoided the garnishment lien as a preference. A dispute arose between the bank (which was also a creditor of Huber Contracting), and certain mechanics' lien claimants who were owed money by Huber Contracting. Both groups asserted competing claims to the $98,750. The money was, of course, property of the bankruptcy estate, so the trustee had a claim to the fund as well. The trustee and the bank entered into a compromise whereby, if the bank could successfully defend its claim to the money, it would share the fund with the trustee, 25% to the estate and 75%

to the bank.  The bank then filed a motion to determine lien priority with respect to the money, naming all other potential claimants to the fund.  Both the owner of a property for which Huber had been the general contractor and various lien claimants whose liens arose from work done on the owner's property filed responses to the bank's motion.  The matter was submitted to the court on agreed facts.  For the reasons detailed below, the court holds that the bank has the superior claim to the $98,750 on deposit with Wachovia Bank N.A.

# I. BACKGROUND FACTS

Huber Contracting, Ltd., the debtor, was a general contractor.  Huber was hired by Mardi Gras Parade Café, LLC to construct a hotel.  Among others, the debtor hired Argosy Floor Covering, Opening Specialties & Supply, Samuels Glass Company, and R.W. Jones (the "Lien Claimants") as sub-contractors on the project.  The Lien Claimants were not paid for their work by Huber, and ultimately perfected mechanic's liens on the owner's property in accordance with the provisions of Chapter 53 of the Texas Property Code.

Well prior to these events, Huber had signed a promissory note and security agreement in favor of Wachovia Bank, N.A., formerly known as SouthTrust Bank, to obtain a $500,000 working capital loan, extending and renewing prior notes, all of which had been (and still were) secured by all of the debtor's assets.  The bank perfected its lien, properly amending its UCC-1 financing statements after each loan renewal.

On November 4, 2004 (after the most recent renewal of its note and security agreement with the bank), the debtor submitted a draw request for $399,010.42 to Mardi Gras.  The request was approved by Mardi Gras and, on November 11th or 12th, the debtor drew out the funds from the construction loan, and deposited the funds into its account at the Bank.  Days later, on November

2

15, 2004, the Bank was served with a writ of garnishment by one of the debtor's creditors.  The bank then froze debtor's deposit account, honoring the writ.

Huber filed for bankruptcy relief, the trustee set aside the garnishment lien, the bank and the trustee made their settlement, and the bank and the lien claimants submitted their competing claims to this court for disposition.

## II. ISSUE

The essential issue to resolve here is a simple one to state: as between the bank and the lien claimants, whose rights are paramount with regard to the $98,750?  The resolution of that issue is not at all simple, however, requiring the court to reconcile two different legislative schemes, one set out in the Texas Property Code and the other in the Texas version of the Uniform Commercial Code. The bank claims that its Article 9 perfected security interest in the debtor's deposit accounts trumps any competing claim by the Lien Claimants.   The Lien Claimants retort that they have a priority over all other creditors, including the Bank (regardless of its security interest), by virtue of provisions in Chapter 53 of the Texas Property Code.

The bank starts its argument with Revised Article 9 of the Uniform Commercial Code as enacted in Texas in 2001 which permits a secured party to obtain a security interest in deposit accounts.  Section 9.327 lays out a priority scheme with respect to security interests in deposit accounts.  The bank says that this statute is the sole source of law for resolving competing priority claims in deposit accounts and that, under that section, the bank comes first.  *See* TEX.BUS. & COMM. CODE ANN., § 9.327 (West pamphl. ed. 2005).

The lien claimants counter that section 53.121 of the Texas Property Code entitles them to priority in the very same account, notwithstanding the bank's lien and notwithstanding section 9.327

of the Uniform Commercial Code. *See* TEX. PROP. CODE, § 53.121 (West pamphl. ed. 2005). They rely in part on the Fifth Circuit's ruling in *Matter of Waterpoint Intern., L.C.*, 330 F.3d 339, 342-45 (5th Cir. 2003), which noted in *dicta* that lien claimants enjoy a preference over all other creditors of the original contractor, provided the lien claimants have properly perfected their mechanics' and materialmen's liens in accord with chapter 53. The lien claimants in *Waterpoint* had failed to do so (which is why they lost). The Lien Claimants in this case, however, *did* properly perfect their liens. They note that the lien claimants in *Waterpoint* would have prevailed if only they had been properly perfected, and the Lien Claimants should therefore prevail in this case.

To resolve the issue presented, the court must reconcile these two statutes. In a nutshell, does section 9.327 of Revised Article 9, enacted by the Texas Legislature in 2001, trump the ancient and extraordinary protection accorded mechanics' and materialmen's lien claimants by the Texas Legislature as far back as 1869 and now codified in Chapter 53 of the Texas Property Code?

## III. ANALYSIS

### *An Overview*

Section 9.327 of the Uniform Commercial Code ostensibly governs priorities of security interests in deposit accounts. It states, in relevant part, as follows:

> The following rules govern priority among conflicting security interests in the same deposit account:
> . . .
>   (3) Except as otherwise provided in Subdivision (4), a security interest held by the bank with which the deposit account is maintained *has priority over a conflicting security interest held by another secured party*;
>   (4) A security interest perfected by control under Section 9.104(a)(3) has priority over a security interest held by the bank with which the deposit account is maintained.

4

TEX. BUS. & COMM. CODE, § 9.327 (West pamphl. ed. 2005) (emphasis added).[1]  The bank in this case is "the bank with which the deposit account is maintained" and so, according to this statutory provision, has priority "over *a conflicting security interest* held by another secured party."  *See id.* (emphasis supplied).  The bank says this is enough to assure it absolute priority over the lien claimants.

Meanwhile, section 53.121 of the Texas Property Code gives holders of perfected mechanic's liens "preference over other creditors of the principal contractor or builder."  The precise language of the statute reads:

> All subcontractors, laborers, and materialmen who have a mechanic's lien have preference *over other creditors of the original contractor.*

TEX. PROP. CODE, § 53.121 (West pamphl. ed. 2005) (emphasis added).  The lien claimants state that this language gives *them* a priority (or "preference") over Huber's creditors, including the bank.  The mechanic's lien is asserted in the *owner's* property, but, if properly perfected, affords its holder a preference over creditors of the *contractor.  See In re Waterpoint Intern'l, L.C.*, *supra*.

## 1. Background of Mechanic's Liens in Texas

The Fifth Circuit in *Waterpoint* set out in some detail the nearly 200 year history of the Texas mechanic's lien statute, as well as the purpose and policy behind it.  Explained the court:

> The mechanic's lien appeared in Texas in 1839 when the Congress of the Republic enacted "[a]n Act for the Relief of Master Builders and Mechanics of Texas."  The purpose of the mechanic's lien is to secure payment for those who furnish labor or materials in connection with the construction of improvements to real property to the extent of the increased value of those improvements to the owner's property.  In 1869, the right to a mechanic's lien, even for derivative claimants (e.g., subcontractors, mechanics or materialmen who have not contracted directly with the

---

[1] Section 9.104(a)(3) states that a secured party has control of a deposit account if "... (3) the secured party becomes the bank's customer with respect to the deposit account."  *Id.*, § 9.104(a)(3).  No party in this case claims to have this status.

5

owner of the property to be improved), also became a constitutional right in Texas. Article 16, Section 37, of the Texas Constitution now provides that "mechanics, artisans and materialmen of every class, shall have a lien upon the buildings and articles made or repaired by them for the value of their labor done thereon, or material furnished therefor...."

However, as interpreted by the Texas Supreme Court, while the constitutional right to a mechanic's or materialman's lien is broad, the Texas Constitution creates a "self-executing" lien in favor of only original or general contractors (those who contract directly with the property or its agent) not derivative claimants.... Instead, they must comply with the statutory lien perfection requirements to be able to enforce their rights to payment or, if necessary, foreclosure against the owner and his property.

Chapter 53 of the Texas Property Code, entitled "Mechanic's, Contractor's, or Materialman's Lien" and formerly known as the Hardeman Act, controls the procedures for perfecting liens and the relative priority of these liens once perfected.... In general, the chapter deals with relationships between a general contractor, the owner of the real property and derivative claimants. It sets out procedures for connecting a derivative claimant to the owner in order to give the owner notice of the derivative claimant's claim to money still in the owner's hands.

....

In 1983, the Texas Legislature replaced the Hardeman Act with the Code. In so doing, it made clear that a subcontractor's ability to enforce his lien rights under Chapter 53 requires compliance with the lien perfection provision in Chapter 53.

*In re Waterpoint*, 330 F.3d 339, 342-45 (5th Cir. 2003) (internal citations omitted).

Section 53.121 provides an additional protection to subcontractors, over and above the mechanic's lien itself, affording them a "... preference over other creditors of the *principal contractor or builder*." *Id.* Thus, in addition to the right to force the sale of the owner's property, if need be, to assure payment, subs and suppliers also enjoy a preferred status against the principal contractor itself, over other creditors of the principal contractor. *See* TEX. PROP. CODE, § 53.121 (West pamphl. ed. 2005). The language of section was carried forward virtually unchanged from the Hardeman Act. *See* TEX. REV. CIV. STAT. ANN., art. 5464 (Vernon 1982, repealed). Indeed, the

original incarnation of this statute, enacted in 1889, used essentially the same phraseology, including the use of the term "preference." *See Lebo v. Dochen*, 310 S.W.2d 715, 720 (Tex.Civ.App. – Austin 1958, writ ref'd n.r.e.). The meaning and scope of the term "preference" is nowhere explained in the Property Code.

The *Waterpoint* court explained that this additional protection was available only to subs and suppliers who had properly perfected their mechanic's liens against the property on which their work was done or their supplies had been installed. Thus, a prerequisite to having a preference over other creditors of the general contractor (in this case, Huber) is properly perfected mechanics' liens against the owner's property (in this case, Mardi Gras). The Lien Claimants here qualify for the preference.

## 2. Background of Perfecting Security Interests in Deposit Accounts

Article 9 of the Uniform Commercial Code ("UCC") generally provides a uniform scheme for perfecting security interests and determining lien priority. The Fifth Circuit has recognized that Article 9's purpose "is to provide a simple and unified structure within which the immense variety of present-day secured financing transactions can go forward with less cost and with greater certainty." *Haas' Estate v. Metro-Goldwyn-Mayer, Inc.*, 617 F.2d 1136, 1140 (5th Cir. 1980) (quoting Official Comment to § 9-101 and omitting internal quotes). The Texas Legislature first formally adopted Article 9 of the Uniform Commercial Code in 1965 and re-codified the article as Chapter 9 of Title 1 of the Texas Business and Commerce Code in 1967. *See* 66 TEX. JUR. 3d, SECURED TRANSACTIONS § 1 (last accessed on Westlaw Mar. 14, 2006). However, the UCC did not provide a mechanism for holding a security interest in a deposit account short of actual possession of the account. There was no need, therefore, for a section addressing *priorities* among competing

7

claims in deposit accounts, because only possession counted as perfection.[2]

Article 9 was substantially revised in 1999, adding significant new protections and expansions for secured creditors. *Id.* The Texas Legislature adopted those revisions as amendments in 1999, to become effective July 1, 2001. *See id.* Newly revised Article 9 made explicit provision for obtaining a security interest in a deposit account *without* necessarily having physical possession of the account, creating the need for establishing priorities amongst potentially competing interests in the same deposit account.[3] New section 9.327 addresses those new competing lien priorities.

Section 9.327 states that it governs "priority among conflicting *security interests* in the same deposit accounts." TEX. BUS. & COMM. CODE § 9.327 (emphasis added). A security interest is defined, for purposes of Article 9, in section 1.201 of the UCC as "an interest in personal property or fixtures which secures payment or performance of an obligation." TEX. BUS. & COMM. CODE § 1.201(35). The Lien Claimants in this case do not have a security interest in Huber's property – certainly not a security interest in the deposit account where the $98,750 is located.

## 3.  Case Law Addressing the Conflict Between the UCC and the Property Code

No case law yet exists that directly addresses the potential for conflict between section 9.327 of the Texas Business and Commerce Code and section 53.121 of the Texas Property Code. We are not entirely bereft of guidance, however. We earlier adverted to the Fifth Circuit's *Waterpoint* decision. But the district court issued a decision as well, one that helps shed some light on the issue before us in this case. There, Judge Lynn Hughes bluntly stated that "[a] subcontractor's lien is

---

[2] In the words of the television series, *Highlander*, "there can be only one."

[3] Revised Article 9 created the new concept of "control" over such accounts in section 9.104. With this new provision arose the possibility of priority conflicts between parties asserting a security interest by virtue of control and a bank having a perfected security interest in the same account by virtue of its possession of the account (in circumstances in which the account holder is both a customer of the bank and a borrower from the bank).

superior to a secured interest [*citing* Tex. Prop. Code § 53.121]. If Exchanger [the subcontractor] had perfected its lien, any literate person could have awarded Exxon's money properly." *In re Waterpoint,* 279 B.R. 209, 211 (S.D. Tex. 2002). The Fifth Circuit, of course, was not called upon to rule on this particular *dictum* in its decision, but its approach did not call Judge Hughes' observation into question either.

It is unfortunate for all of us that Judge Hughes appears to be the only literate person in a judicial capacity who has written on the question. Unfortunately for us, his *dictum* falls short of the level of precedent. Nonetheless, it is an observation that should be followed if it is otherwise supportable under other principles of statutory interpretation.

## 4. Guidance from the Statutes

### a. *Texas Property Code*

Chapter 53 of the Texas Property Code has a long and venerable history, and its purpose is clear: to protect subs and suppliers from nonpayment. *See Hayek v. Western Steel Co.*, 478 S.W.2d 786 (Tex. 1972); *see also University Savings and Loan Association v. Security Lumber Company*, 423 S.W.2d 287 (Tex.1967); *Oriental Hotel Co. v. Griffiths*, 88 Tex. 574, 33 S.W. 652 (1895). The internal structure of the current incarnation of the Hardeman Act offers little guidance regarding how it should be interpreted when it comes into conflict with other statutes, such as the UCC, however.

One might first look to see what might be learned from the legislature's enactment of Chapter 162, the Texas Construction Trust Fund statute. After all, that statute too affords a remedy to subs and suppliers, but contains an express exemption from its reach for banks (and their collateral).[4] *See* TEX. PROP. CODE, § 162.004(a)(1); *see also RepublicBank Dallas, N.A. v. Interkal,*

---

[4] The statute imposes a trust on "construction payments" for the benefit of subs and suppliers. *See* TEX. PROP. CODE, §§ 162.001, 162.003.

9

*Inc.*, 691 S.W.2d 605, 608 (Tex.1985). However, the very fact that chapter 162 contains an *express exemption* for banks, indicates that, but for that express exemption, banks (and their security interests) *would* be affected by the trust remedy created in chapter 162. The very lack of such an explicit exemption in chapter 53 suggests that secured creditors may *not* similarly be exempted from the reach and impact of that chapter's remedies, including the remedy set out in section 53.121. *See* 2A Singer, *Statutes and Statutory Construction* §47.23 (6th ed. 2000) "[t]he enumeration of exclusions from the operation of a statute indicates that the statue should apply to all cases not specifically excluded").[5]

Nor can it be urged that chapter 162 *supplants* the more ancient remedy set out in section 53.121. Texas case law establishes that the construction trust fund statute was enacted as a *supplement* to existing remedies, not as a replacement.[6] *See McCoy v. Nelson Utilities Services, Inc.*, 736 S.W.2d 160, 164 (Tex.Civ.App. – Tyler 1987, writ ref'd n.r.e.); *Stone Fort National Bank v. Elliot Electric Supply Company, Inc.*, 548 S.W.2d 441, 446 (Tex.Civ.App. – Tyler 1977, writ ref'd n.r.e.); *see also RepublicBank Dallas, N.A. v. Interkal, Inc.*, 691 S.W.2d 605, 606 (Tex.1985) (agreeing with the lower court's conclusion in that case that the construction trust fund statute is an addition to and not a substitute for the existing remedies in chapter 53). Thus, we learn little about how to construe section 53.121 of the Texas Property Code from Texas' enactment of the Construction Trust Fund statute.

---

[5] *See also*, *United States v. Galvan-Perez*, 291 F.3d 401 (6th Cir. 2002). The interpretation also makes sense when one considers that chapter 162 was not meant to nullify the remedy in section 53.121. *See* discussion *infra*; *see also* Singer, § 47.06 (requiring all sections of an act that are related to the same subject matter to be read together).

[6] Chapter 162 is a codification of article 5472e of Texas' revised civil statutes, enacted in 1967. *See* Tex. Rev. Civ. Stat., art. 5472e (Vernon 1968) (repealed); *see also Owens v. Drywall & Acoustical Supply Corp.*, 325 F.Supp. 397, 400 (S.D.Tex. 1971).

10

### b. *Article 9 of the UCC*

Article 9 underwent a major revision over the last decade. Texas adopted the revised version in 1999. Revised Article 9 contains a number of new innovations, including provision for the ability to take a security interest in a deposit account without having to have possession of the account. *See* discussion *supra*. By its own terms, however, new section 9.327, addressing priority disputes, applies only to "security interests," a defined term in the UCC.[7] A security interest is defined in section 1.201 as "an interest in personal property or fixtures which secures payment or performance of an obligation." TEX. BUS. & COMM. CODE, § 1.201 (West Supp. 2005); *see also id*, § 9.102, Comment 1 (West 2002) ("Note that the definition of "security interest" is found in Section 10201, not in this Article ..."). While it may not be entirely clear precisely what the scope of the term "preference" ought to be (as that word is used in section 53.121 of the Property Code), it seems safe to say that it is not a "security interest" as that term is defined in the UCC. Thus, section 9.327 itself tells us little about the "priority" that ought to be accorded (if any) to the "preference" granted by section 53.121 of the Texas Property Code.

Section 9.109 addresses the scope of Revised Article 9. In subsection (a), we are told that Article 9 *does* apply to, *inter alia*, transactions that create a security interest by contract, the sale of accounts, chattel paper, payment intangibles, and promissory notes, security interests that arise under the chapter on Sales (Article 2), and to security interests arising under the chapter on Bank Deposits and Collections (Article 4) and the chapter on Letters of Credit (Article 5). *See* TEX. BUS. & COMM.

---

[7] *See* TEX. BUS. & COMM. CODE § 9.327 (emphasis added). Section 9.109(a) explains that, except as otherwise provided, "this chapter [*i.e.*, Article 9 of theTexas UCC] applies to (1) a transaction, regardless of its form, that creates *a security interest* in personal property or fixtures by contract; ... (3) a sale of accounts, chattel paper, payment intangibles, or promissory notes; ... (5) a *security interest* arising under Section 2.401, 2.505, 2.711(c), or 2A.508(e), as provided in Section 9.110; and (6) a *security interest* arising under Section 4.210." TEX. BUS. & COMM. CODE § 9.109(a) (emphasis added).

CODE, § 9.109(a).  None of these categories applies to the "preference" accorded the Lien Claimants

under section 53.121 of the Property Code.

In subsection (c), we are told that Article 9 does not apply to the extent federal law pre-

empts, or another state statute "expressly governs the creation, perfection, priority, or enforcement

of a security interest created by this state or a governmental unit of this state."  See TEX. BUS. &

COMM. CODE § 9.109(c).  These exclusions do not apply to the preference accorded the Lien

Claimants by section 53.121 of the Texas Property Code.

Section 9.109(d) lists thirteen categories of liens and lien-like events to which Article 9 does

not apply.  Of the thirteen, the only category that even comes close to the preference provisions of

section 53.121 of the Property Code is the second listed, "a lien ... given by statute or other rule of

law for services or materials ...."  *Id.*, at 109(d)(2).  It is true that the Texas Property Code does

indeed give a subcontractors and materialmen the opportunity to obtain a lien (which is why they

are referred to in this decision as "the Lien Claimants"), but not on the *contractor's* property.  *See*

TEX. PROP. CODE § 53.021.  Indeed, in order to obtain the "preference" over other creditors of the

contractor granted in section 53.121, they must properly perfect their lien claims in the *owner's*

property.  *Id.* at 53.051-53.059.  Our case does not involve competing claims on the *owner's*

property, however.  It involves competing claims on the *contractor's* property, to wit, money that

was in the contractor's deposit account.

But suppose the reference to "lien" in section 9.109(d)(2) *were* construed broadly enough

to include the "preference" granted in section 53.121 of the Texas Property Code.  What then?  This

subsection contains an interesting "but" clause: "but Section 9.333 applies with respect to priority

of the lien."  TEX. BUS. & COMM. CODE, § 9.109(d)(2).  Thus, if the preference granted in the

Property Code is a lien, then the resulting lien will be subject to the priority rules in section 9.333 of Texas' UCC. But it turns out that this little discovery is a rabbit trail leading to a dead end. Section 9.333(b) provides that "[a] *possessory* lien on *goods* has priority over a *security interest* in *goods* unless the lien is created by a statute that expressly provides otherwise." TEX. BUS. & COMM. CODE §9.333(b) (emphasis added). Whatever section 53.121 of the Texas Property Code grants, no one could describe it as a "possessory lien."[8] Besides, section 9.333(b) only resolves priority disputes with regard to liens on *goods*. *See id.* A depository account is not a "good" within the meaning of Article 9. *See* TEX. BUS. & COMM. CODE § 9.102(44).

Thus, Revised Article 9 does *not* address the potentially competing priorities created by other state law in the funds involved in this case, and we learn no more from the structure or language of this statute than we did from an examination of the structure and language of the Property Code.

To make matters worse, the reference in section 53.121 of the Texas Property Code to a preference "over other creditors" of the original contractor gives no hint whether "other creditors" means *all* creditors, without regard to their lien claims on property of the original contractor (including the original contractor's deposit accounts), or simply to *unsecured* creditors of the original contractor.

**5. Other Sources**.

    **a. The Bankruptcy Code**

Perhaps the use of the phrase "preference" in section 53.121 of the Texas Property Code indicates a first priority for subcontractors only over the competing claims of unsecured creditors,

---

[8] An example of a common possessory lien to which section 9.333(b) might refer is that afforded an automobile repair shop to secure payment of the bill for auto repairs. *See* TEX. PROP. CODE § 70.001(a).

13

as it does tacitly under the Bankruptcy Code.[9]  The history of section 53.121, however, will not support the view that the Texas Legislature was borrowing either the terminology or the concept from federal bankruptcy law.  The term was found in the predecessor enactments of section 53.121 as early as 1889, long before there ever was a Bankruptcy Code (or the Bankruptcy Act of 1898, for that matter).[10]  There is no legislative history to the original enactment that this court could find (if it exists at all), but what we do know is this: in 1889, the U.S. was without a bankruptcy law.  What is more, everyone's memories of the last bankruptcy law (the Bankruptcy Act of 1867) were so vile that it was hardly likely to serve as the inspiring model for other legislation, and was repealed with great relief in 1878.[11]

In short, we learn little from the language of bankruptcy laws.

**b.  19th Century Statutes and Case Law**

Another possible place to look for assistance in decoding the statutory expression "preference over other creditors" is case law and statutes contemporary to its first use in 1889.  Here, we find a much richer source.

---

[9] A preference in section 547(b) is a transfer of property by the debtor to pay an antecedent debt such that that creditor receives more than it would have received without the transfer in a liquidation proceeding.  Usually, this means either that an unsecured creditor receives full payment while others must rely on partial *pro rata* payment in bankruptcy (a kind of priority) or that an unsecured creditor becomes secured such that it can expect partial or complete satisfaction of its claim out of collateral while other, less fortunate creditors must look only to their *pro rata* payment (another kind of priority).  The statute, by its terms, does not describe preferences in terms of priority of payment over other unsecured creditors as such, however.

[10] To be precise, the first enactment to contain the phrase was apparently enacted in 1889.  *See Lebo v. Dochen*, 310 S.W.2d 715, 720 (Tex.Civ.App. – Austin 1958, writ ref'd n.r.e.).  That court quoted from the original 1889 law, which included this sentence: "But no owner or proprietor shall in any case be required to pay, nor his property be liable for any money that he may have paid to the contractor before the fixing of the lien or before he has received written notice of the existence of the debt, *and all subcontractors, laborers, and material men shall have preference over other creditors of the principal contractor or builder*."  *Id.* (emphasis added).

[11] The Bankruptcy Act of 1867 law was finally repealed in 1878 by a bill sponsored by Senator McCreary, of Kentucky, who described the 1867 Act as "an assault upon public morals, in its violations of good faith, in its craft, its falsehoods and frauds."  *See* C. Warren, Bankruptcy in United States History, at 122 (Harvard University Press 1935).

### i. "Preference over other creditors" was frequently used in fraudulent conveyance case law in the nineteenth century.

The phrase "preference over other creditors" can be found in nineteenth century Texas decisions dealing with the perceived evil of secret liens as a means of accomplishing fraudulent conveyances.[12] In the nineteenth century, borrowers often tried to give a favored creditor "preference over other creditors" with a "secret lien," with the intention of defeating the interests of other creditors (often a more distant creditor, such as a bank). The tactic was often handled by the courts as a species of fraudulent conveyance.[13] Courts recognized that there was nothing inherently wrong with "preferring" a particular creditor by paying that creditor ahead of some other creditor, so long as the "preference" was not with fraudulent intent.[14] The "secret lien" was considered by the courts to be one indication of such fraudulent intent.[15] The preference obtained by such a lien or mortgage elevated the preferred creditor above other unsecured creditors, without their knowledge. But for fraudulent conveyance laws, an unsecured creditor would be defeated by the lien or conveyance, which would remove the property from the pool of assets available for attachment. "Preference over other creditors," in this sense then, referred to the use of liens as a

---

[12] *W.D. Gamble & co. v. Talbot,* 1885 WL 6575 (Tex. Ct. App. 1885); *L.A. & W.O. Ellis v. A.S. Valentine & Son,* 65 Tex. 532, 1886 WL 4710, 10-12 (Tex. 1886); *Oppenheimer v. Halff,* 68 Tex. 409, 4 S.W. 562 (Tex. 1887); *Black v. Vaughan,* 70 Tex. 47, 7 S.W. 604 (Tex. 1888); *Mack v. Block,* 8 S.W. 495 (Tex. 1888); *Arbuckle Bros. Coffee Co., v. Wenar,* 77 Tex. 43, 13 S.W. 963 (Tex. 1890); *Morton v. Hull,* 77 Tex. 80, 13 S.W. 849 (Tex. 1890); *Foreman v. Burnette,* 83 Tex. 396, 18 S.W. 756 (Tex. 1892); *Johnston v. Standard Shoe Co.,* 24 S.W. 580 (Tex. Civ. App. 1893); *Biccochi v. Casey-Swasey Co.,* 91 Tex. 259, 42 S.W. 963 (Tex. 1897).

[13] *Id.*

[14] *L.A. & W.O. Ellis,* 1886 WL 4710 at 10-12,); *Johnston,* 24 S.W. at 581 (Tex. Civ. App. 1893) ("A party who is insolvent may execute a chattel mortgage upon his property to pay his honest debts, and my give preference among his creditors. But a mortgage executed ... with intent to hinder, delay, or defraud his creditors is void as to any such creditor who has notice of such fraudulent purpose, and assists in the execution of it.").

[15] *See e.g., Johnson,* 24 S.W. at 581, *supra* n. 14; *Mack,* 8 S.W. at 497 ("It may be conceded that Porst was insolvent, and that he executed the instrument ... with intent that through it the appellees might obtain a preference over other creditors....").

means of perpetrating a fraud on other unsecured creditors.

But could the expression also be meant to apply to preference over other *secured* creditors as well?  To help answer that question, we turn our attention to the development and application of recording statutes in Texas during the nineteenth century.

### ii.  Recording statutes were well established by the late nineteenth century and aided in the application of the "first in time" principle, to which courts of the time adhered.

Recording statutes were already well-established in the 1890's.  A species of recordation can be traced back to the days before Texas became a republic.[16]  Recording statutes were not originally enacted to facilitate secured lending by banks, however.  In the nineteenth century, banks did not generally lend on a secured basis.  Instead they relied on personal guarantees provided by friends of the borrowers to assure repayment by their borrower.[17]

Early recording statutes were enacted to serve a quite different purpose – as an antidote to secret liens.  With recordation, a person would be less able to re-mortgage the same property for new funding, or to secretly transfer property in anticipation of judgment remedies.[18]  Recordation also aided in the application of another principle honored by the nineteenth century courts – the principle

---

[16] George Lee Flint, Jr.  and Marie Juliet Alfaro, *Secured Transactions History: The Impact of English Smuggling on the Chattel Mortgage Acts in the Spanish Borderlands,* 37 VAL.  U.  L.  REV.  703, 761-72 (2003).

[17] George Lee Flint, Jr.  and Marie Juliet Alfaro, *Secured Transactions History: The First Chattel Mortgage Acts in the Anglo-American World,* 30 WM. MITCHELL L. REV. 1403, 1443 and n.  219 (2004) (hereinafter "Flint & Alfaro") ("The banks generally lent, not based on collateral, but based on guarantees, usually from commercial merchant members or their substantial friends").  When banks would lend on a secured basis, they only did so in exchange for "strong collateral, usually government bonds or real estate mortgages...."  *Id.*; *see also L.A. & W.O. Ellis,* 1886 WL 4710 at 1  ("He [an individual investor] asked for security, but they [the borrowers] said they did not want to ask *their friends* to endorse for them further.  At this time they owed the bank about $32,000, for which the bank held their notes, most of which were endorsed by *their friends*.") (emphasis added); *Schmick v.  Bateman,* 14 S.W. 22, 22, 77 Tex.  326, 328 ("[H]e received in advance $3,000; and, to secure the cattle company, he executed a bond in the sum of $5,000 ... on which appellees and others became sureties.").

[18] Flint & Alfaro, at 1405 (2004); *J.F. Brothers,* 1883 WL at 3 ("One great object of the statute [chattel mortgage statute] would be defeated, viz., a prevention of secrecy and imposition in the execution of such instruments and the transfers which they evidence....").

16

of first in time, first in right – usually in the context of attachment liens in aid of judgments obtained by creditors.[19]

The "first in time" rule bears further examination in the context of a particular kind of lien competition bearing some similarities to the subcontractor versus secured creditor dispute at issue in this case. Landlords, like subcontractors, enjoyed special protection from the legislature in the late nineteenth century, and were given a statutory lien that had a relation-back feature. Obvious problems with the first in time, first in right rule inevitably arose, especially between these statutory liens (denominated as "preference liens") and chattel mortgage liens, and were discussed in the case law of that period.[20]

### iii. Landlords' "preference liens."

Landlords' liens in the nineteenth century were the closest analogy to what we call "priming liens" today – liens that truly arise and attach *after* another validly recorded lien such that the lien has equal or superior rights in the same collateral.[21] The extent of the priming accorded these

---

[19] 17 TEX. JUR. 3d Creditor's Rights and Remedies § 202 (2006) (citing *Walker v. Houston,* 29 S.W. 1139 (Tex. Civ. App. 1895); *see also, Wynn v. State Nat'l Bank of Ft. Worth,* 17 S.W. 918, 919, 82 Tex. 378, 381 (Tex. 1891) ("The attachment ... being first in time [ ] created ... a valid lien upon the legal title prior to all others."); *Sanger v. Tramwell,* 1 S.W. 378, 378 66 Tex. 361, 362 (Tex. 1886) ("Upon the fact of the papers the levy of the appellants was first in time; his lien was the eldest, and his title complete to the land in controversy as against the right subsequently acquired by the levy of the appellees."); *Schmick v. Bateman,* 14 S.W. 22, 77 Tex. 326 (Tex. 1890) (an attachment of personal property that is subject to a perfected chattel mortgage does not divest the lien of the mortgage; the property or interest that may be taken under the writ is subject to the mortgage). If an attachment was levied upon collateral that was subject to a validly recorded mortgage, then the attaching creditor *and the sheriff* could be liable for conversion. *Id.*

[20] *Am. Type Founders' Co. V. Nichols,* 110 Tex. 4, 31-36, 214 S.W. 301, 315-17 (Tex. 1919)(J. Hawkins, dissenting) (the dissent provides a good summary of the relevant case law spanning 1883-1913); *see also, Collins v. McFarland,* 60 S.W.2d 334, 335 (Tex. App. - Amarillo (1933) ("While under the statute the landlord's lien is declared to be a 'preference lien' upon certain personal property of the tenant, it does not have the effect of making such lien superior to a chattel mortgage. The priority of right between two such lienholders will be determined by the rule of 'first in time, first in law.' "

[21] *See* David A. Skeel, Jr., *Creditors' Ball: The "New" Corporate Governance in Chapter 11,* 152 U. PENN. L. REV. 917, 923 (2003) ("[A] so called 'priming lien' ... is [ ] a security interest that takes priority even over existing security interests in the same collateral.").

preference liens should shed some light on whether the preference accorded subcontractors also primed such lienholders.[22]

The Texas Supreme Court explained in a case from 1887, *Marsalis v. Pitman*: "[t]he landlord's lien exists by force of these statutes, and not simply by force of the levy of the process which the law provides to be used to enforce it, and attaches to any property owned by the tenant, and placed on the rented premises during the term...."[23]  Landlords were accorded this favorable treatment as early as 1874 with respect to agricultural lands.[24]  In 1879, landlords' liens were given explicit expanded applicability to other types of renting relationships as well.  The 1879 act provided:

> that all persons leasing or renting any residence, or store-house, or other building, shall have a *preference lien* upon all the property of the tenant in said residence or store-house or other building, for the payment of the rents due, and that may become due, and such lien shall continue and be in force so long as the tenant shall occupy the rented premises and for one month thereafter.[25]

But while statutory landlords' liens attached as of the beginning of the lease term, the landlord could not *enforce* the lien until the tenant defaulted or was about to default on his rental obligation.[26]  The preference lien *attached* to the tenant's property when the lease began, but the lien

---

[22] We analogize because there are no cases from the period involving subcontractor preferences and chattel mortgages.

[23] *Marsalis v. Pitman,* 68 Tex.  624, 626 ,5 S.W. 404, 405 (Tex.  1887); *see also* quotation of the statute, *infra.*

[24] *Marsalis,* 5 S.W. at 404.

[25] *Id.*  at 404-405.  Additional evidence of the special power landlords' liens were given is found in articles 2549 and 3327 of the 1895 statutes which stated that "nothing in this article shall be construed to contravene the landlord and tenant act."  *Bowen v.  Lansing Wagon Works,* 91 Tex.  385, 390, 43 S.W. 872, 874 (Tex.  1898).

[26] *Marsalis,*  at 406.

18

could not be enforced until a later date when there was an actual or anticipated default.[27]   At that point, a court would then be called upon to determine lien priorities, reverting to a traditional "first in time, first in right" inquiry.[28]   The relation-back allowed by the statute only permitted the landlord to "prime" other interests that might have attached before the landlord's efforts to enforce, but *after* the landlord/tenant relationship was created.   Thus, any creditor who obtained a lien on property located on the leased premises *after* the lease began was subordinated to the landlord's preference lien, because that lien was not "first in time."[29]   By the same token, if the tenant granted a chattel mortgage on property located on the premises *before* the lease was made (and before the property in question was located on the leased premises), then the chattel mortgage holder would prevail in any lien dispute, because under the rules of first in time, first in right, the chattel mortgage would have attached to the property *before* the statutory lien "attached."[30]

---

[27] *Marsalis*, at 405-06 ("The statute regulating the manner and right to enforce, by distress, the payment of rent, denies the right to use it unless the rent is due, if the tenant be not about to remove from the leased premises, or about to remove his property therefrom; but if the tenant be about to do either of these things, then the right to distrain for rent is given. The purpose of a distress warrant is not to fix a lien, but to seize and secure property on which the law has given a lien, that it may be sold in satisfaction of the debt or demand secured by the existing lien."). The "distress warrant" was the primary enforcement mechanism used by landlords to enforce their liens. The "distress warrant" continues to exist today as an enforcement mechanism for landlords. *See* Tex. Prop. Code §§ 54.006, 54.025 (West 1995).

[28] *Am. Type Founders' Co.,* 110 Tex. at 6-7, 214 S.W. at 301 ("Yet nothing is better settled in Texas than that this preferred lien is subordinate to pre-existing mortgages." (citations omitted)); *see also,* n. 19 *supra.*

[29] The priming occurred when a tenant gave a chattel mortgage on property that had already been in located on the leased premises and thus already subject to the landlord's lien. The landlord's lien did not attach to property until the property was actually placed inside the leased premises. Thus, a chattel mortgage holder could protect itself from priming by recording *before* the property was placed on the premises. *See* n. 19, *supra; see also Collins v. McFarland,* 60 S.W.2d 334 (Tex.Civ.App. – Amarillo (1933). In *Collins*, the lease was entered into on October 6, 1931. The tenant executed a chattel mortgage for property to be placed in the leased space on October 7th or 8th, however the tenant did not file the mortgage of record until October 9th. The landlord claimed priority in the chattel because the chattel mortgage had not been filed until *after* the property was placed onto the leased premises. The landlord's lien normally would have attached at the moment the property was moved into the building, priming the chattel mortgage holder. The court held that the chattel mortgage act did not require such strict time enforcement, however. and concluded that the chattel mortgage was superior because it had been filed "forthwith" (interpreted by the court in this case to mean "as soon 'as it reasonably can be' ").

[30] There is some authority for the proposition that the statutory landlord's lien would not even attach until the point of a default in rent, at which point it would "relate back" to the inception of the lease and prime any subsequently created chattel mortgage on the same property. *See Marsalis,* at 406 ("The statute regulating the manner and right to enforce, by distress [warrant], the payment of rent, denies the right to use it unless the rent is due."). Later case law undermines this

The "preference lien" accorded landlords, then, had only a limited priming impact.  It did not prime other liens for all purposes, but only to the extent explicitly provided in the statute.  Furthermore, the preference was specifically denominated as a preference *lien*, and only by virtue of that status was it held to prime other liens.

A similar attachment and relation-back mechanism was also enacted in the late nineteenth century, as part of a larger scheme of protection for the benefit of subcontractors and suppliers.  We look at that scheme next.

> ### iv.  Nineteenth century mechanic's liens functioned much like landlords' preference liens, with a relation back feature.

The Texas legislature enacted a "relation-back" statutory lien for subcontractors and suppliers (or "mechanics and materialmen") in 1889.[31]  In 1895, the 1889 enactment was incorporated into the Revised Civil Statutes as Article 3301.[32]  Article 3301 provided that

> "[t]he lien herein [provided to mechanics and materialmen] provided for shall attach to the house, building, improvements or railroad for which they were furnished, or the work was done, in preference to any prior lien or incumbrance or mortgage ... at the inception of the lien...."[33]

---

reading, however.  For example, the landlord's right to a distress warrant arose if the tenant was about to *remove* property from the leased premises or abandon it altogether, regardless whether there was, at that point, an existing event of default.  *See H.R.E., B.&B. Ass'n v. Cochran*, 60 Tex.  620 (Tex.  1884).  The restraint on the tenant's ability to freely dispose of its property as a result of this rule was mitigated because the landlord's preference lien was held to be superior only for a period of twelve months.  *See id., see also Gray v. McFadden*, 8 S.W.  2d 293 (Tex.  Civ.  App.  1928).  Further mitigating the restraint was Article 5224 (Revised Statutes 1895 arts.  3238, 3251; Vernon's Ann.  Civ.  St.  articles 3930, 5224, 5238) which exempted tenants who sold goods in good faith and in the regular course of business.  *Freeman v.  Collier Racket Co.,* 100 Tex.  475, 101 S.W.  203 (Tex.  1907); *Freeman v.  Collier Racket Co.,* 44 C.A.  177, 105 S.W.  1130 (Tex.  Civ.  App.  1906).

[31] Acts 1889, 21st Leg., p. 110, *reprinted in* General Laws, vol. 9, at page 1138.  Essentially the same scheme is now in the Texas Property Code at section 53.123.  *See* TEX. PROP. CODE, § 53.123 (West 1995) (historical and statutory notes).  The same 1889 enactment also contained the predecessor to section 53.121 of the Texas Property Code.  *See* TEX. PROP. CODE, § 53.121 (West 1995) (historical and statutory notes).

[32] *Id.*

[33] *Hamman v.  H.J. McMullen & Co.,* 122 Tex.  476, 484, 62 S.W. 59, 62 (Tex.  1933) (citing Article 3301).

The "inception" related back to the date when "a contract was made under which work was to be done or material furnished."[34]  The relation-back could only be triggered, however, as and when there was a default – the subcontractor was not paid by the contractor.  Like the landlord's lien, the word "preference" took on its priming quality by virtue of its being connected to the term *lien*.

So what are we to make of other statutory provisions enacted in the larger scheme of according protection to subcontractors, provisions which used the word "preference " unhinged from the lien context?

> **v.  In the nineteenth century the "preference over other creditors" received by unpaid subcontractors was part of a larger scheme to ensure their payment, but the scheme did not contemplate priming secured creditors.**

Another device enacted to protect subcontractors and suppliers consisted of a trapping and retention mechanism.[35]  The Texas Supreme Court, in *Fullenwider v. Longmoor*,[36] described how the remedy  worked:

> Article 3178 [of the Revised Civil Statutes as amended by the act of March 28, 1885] substantially provides that, in all cases where a lien has been fixed as shown by any person other than a contractor, it shall be the duty of the contractor to defend any action brought thereupon at his own expense, and that during the pendency of such action the owner *may* withhold from the contractors the amount of money for which such lien shall be filed, and that subcontractors, laborers, and material-men shall have *preference over other creditors* of the principal contractor to the extent of the money due them from such principal contractor ... and that the money due the principal

---

[34] Tully R.  Florey, III, *Comment, Priority of Mechanics' and Materialmen's Liens in Texas*, 40 Tex.  L.  Rev.  872, 878 (1961-1962) (citing *Sullivan v.  Texas Briquette & Coal Co.,* 94 Tex.  541, 63 S.W.  307 (Tex.  1901).  Prior to 1889, the word "accrual" was used instead of "inception" and courts held that mechanics' liens attached for relation-back purposes to the date when work was performed or materials supplied. *Trammel v.  Brown,* 4 S.W.  377, 379, 68 Tex.  210, 212 (Tex.  1887) (citing two other Texas Supreme Court cases for the same proposition).

[35] Texas Rev.  Stat., art.  3178 (1885); *see also Fullenwider v.  Longmoor,* 11 S.W.  500, 501, 73 Tex.  480, 483 (Tex.  1889) (emphasis added).

[36] *Fullenwider v.  Longmoor,* 11 S.W.  at 501, 73 Tex.  at 483 (emphasis added).

contractor from the person having the improvements made shall not be garnished by other creditors to the prejudice of such subcontractors, laborers, or materialmen.[37]

This trapping and retention remedy afforded the subcontractor two additional sources for payment. First, the subcontractor or supplier could be assured that the owner on whose property the work was being done would (to avoid liability to the subcontractor) trap and retain monies otherwise due to the contractor, in an amount equivalent to the lien. Second, the subcontractor (which already had the right, as a matter of contract, to hold the contractor liable) was accorded a "preference over other creditors" of the contractor. Significantly, this latter feature did not employ the phrase "preference lien," as did the statutory landlord's lien. The preference was simply one "over other creditors" of the contractor, who might, for example, attempt to collect on the contractor's indebtedness to them by garnishing monies owed the contractor by the owner. The trapping and retention provisions protected the trapped fund from an otherwise valid garnishment. Garnishment is a species of attachment, an enforcement mechanism employed by an otherwise *unsecured* creditor.

Monies coming into the hands of the original contractor (expected to come from the owner) would thus, by statute, be payable first to unpaid subcontractors and suppliers, and then to the contractors "other creditors." In the nineteenth century, the contractor would not normally have pledged these receivables to a bank, so the question of priming a secured creditor would not even have arisen.[38] Considering how a priming intent was normally accomplished with language that was

---

[37] *Id.* Article 3178 was later superseded by the Acts of 1889, the progenitor of section 53.081 of the Texas Property Code. *See* TEX. PROP. CODE, § 53.081, Historical and Statutory Notes (West 1995).

[38] The use of accounts receivable financing in Texas would have been difficult, given that Texas did not recognize the pledge of future accounts even into the early twentieth century. *See* David Cohen & Albert B. Gerber, *Mortgages of Accounts Receivable*, 29 GEO. L.J. 555, 559 n. 12 (1940-41) ("In Texas, although a mortgage of after acquired property has always been valid, Richardson v. Washington & Costley Bros., 88 Tex. 3339, 31 S.W. 614 (Tex. 1885) ... no such effect is accorded to security transactions involving future accounts. First Nat. Bank of Houston v. Campbell, 193 S.W. 197 (Tex. Civ. App. 1917); but *cf.* Coppard v. Martin, 15 F. (2d) 743 (C.C.A. 5th, 1926) ..."). The use of accounts receivable as

express (usually by using the term "preference lien"), it seems unlikely that this more general language would have been understood to prime the rights of creditors who had a pre-existing right to be paid out of a particular piece of property, *i.e.*, lien creditors and mortgage holders.[39]

Further support for this extrapolation comes from the comprehensive scheme the legislature had already put into place for subcontractors, expressly granting them a lien – namely, a lien on the *owner's* property on which their work (or supplies) had been incorporated. The owner could protect itself from the effects of that lien by withholding funds from the original contractor (the trapping and retention provisions). Finally, the fund to be paid to the contractor from the owner could not be garnished by the original contractor's creditors (in effect assuring a preference for subcontractors over other unsecured creditors). Nothing in the statutory language employed by the legislature of the nineteenth century reflects any intention to grant an *additional* lien on the contractor's property, or any kind of priming of secured lenders of the original contractor – indeed nothing suggests that the legislature even contemplated that the original contractor would even *have* secured creditors (or at least secured creditors with accounts receivable as collateral).

---

collateral for financing began around the 1920's, but did not become a mainstay until the 1940's. *See* GRANT GILMORE, 1 SECURITY INTERESTS IN PERSONAL PROPERTY, § 8.1 at 250 (1965). Their genesis, however, appears to have been as collateral for construction loans in the Northeast in the 19th century. *See id.*, § 7.10 at 232-33.

[39] *See L.A. & W.O. Ellis,* 1886 WL at 11 ("No creditor, without lien, has the right to have the debt due to him paid out of any particular property of the debtor. All creditors have the same right to have their debts paid out of the property of the debtor, unless, by contract ... or by legal process, one or more acquire a right to be paid out of the proceeds of some particular property, or have some particular thing, by way of sale, in satisfaction of his or their debt."). The court has found only one case that even suggests that the generic term "creditor" included creditors secured by a judgment lien or a statutory lien. *See Bowen v. Lansing Wagon Works,* 91 Tex. 385, 391, 43 S.W. 872, 875 (Tex. 1898). That case involved the construction of a statute effectively invalidating unrecorded liens as against certain classes of "creditors," as that term was used in that particular statute. Said the court, "creditors *as here used* [*i.e.*, in the secret lien statute] has been generally held to mean persons whose claims have been fixed by some legal process as liens upon the property [*i.e.*, judgment liens and statutory liens]" [citing cases]. *Bowen,* 43 S.W., at 875 (emphasis added). One cannot derive a general rule regarding the meaning to be given the term "creditor" in another statute from the construction given the term in the statute considered in *Bowen,* given the court's own limitation of the extent of its ruling ("as here used").

The foregoing analysis suggests that the term "preference over other creditors" as used in the nineteenth century version of what is now section 53.121 of the Texas Property Code was not likely to have meant a preference over a contractor's secured creditors. Rather, the phrase was more likely to have been intended to function as a preference over the original contractor's general unsecured creditors – creditors who would not otherwise have a right to be paid out of any particular piece of the contractor's property.

### vi. Conclusion of analysis of nineteenth century case law and statutes.

The foregoing extended analysis of nineteenth century law strongly supports the conclusion that the language in question ("preference over other creditors") does not function to prime a contractor's secured creditors. Courts of the nineteenth century gave great deference to recording statutes because of their importance in combatting the evil of secret liens. Courts of the time also vigorously applied a "first in time" rule to determine relative priorities, and priority was in turn based on either recordation or statutory attachment (even when the statutory lien had a relation-back feature, as did both landlords and mechanics liens).

Likewise, the Texas legislatures of the nineteenth century knew how to "prime" other lien holders and they did not do it with the use of the word "preference" by itself. Instead, they did it with statutory liens that were expressly superior to other liens, such as the landlord's lien. Or they expressly stated that the lien was given "in preference to any prior lien" such as in the predecessor to the current section 53.123 of the Texas Property Code. The 1889 law that gave subcontractors the statutory status of "preferred" creditors was enacted as part of a larger scheme of protections assuring their payment (including a lien on the owner's property, and a right to trap funds in the hands of an owner on notice) before other general unsecured creditors who had no right to be paid

out of any particular piece of property.

In short, it appears that section 53.121, in its original incarnation, was enacted for a day and age when principal contractors would not have had secured debt – certainly not pledged receivables or deposit accounts.

Is section 53.121, then, merely vestigial?  Perhaps not, as it still has meaning and effect relative to a principal contractor's other unsecured creditors.[40]  The times, to be sure, have largely overtaken its usefulness.  But it is hardly without meaning.

## IV. CONCLUSION

After an extensive review of all the sources available, this court concludes that section 53.121 does not accord subcontractors and suppliers a priority over a contractor's secured creditors. That, in turn, means that the deposit account in question, clearly impressed with a lien in favor of the bank, is not further burdened by an inchoate claim in favor of subcontractors and suppliers.  The only authority to the contrary is the *dicta* in Judge Hughes' lower court decision in *Waterpoint*.[41] While this court can see how a facial reading of section 53.121 could lead one to make the observation he made in that decision, that observation falls well short of the standard of precedent. What Judge Hughes observation *does* tell us is that we would all be better served by a small but important clarification to the language of section 53.121, to wit, the addition of the word "unsecured" just before the word "creditors."[42]

---

[40] We imagined a case where a solvent general contractor decides not to pay one particular subcontractor and pay all of the other subcontractors and general unsecured creditors.  A properly perfected subcontractor could possibly turn to the state courts to demand that the contractor pay it before it pays any other general unsecured creditors without the hassle of a formal lawsuit with discovery and a trial.

[41] *See In re Waterpoint*, 279 B.R. 209, 211 (S.D. Tex. 2002) (Hughes, D.J.).

[42] Or, if the Texas Legislature really means to confer a priming lien in favor of subcontractors and suppliers in section 53.121, to make that intention explicit.

25

In all events, for purposes of this decision, the court rules in favor of the bank, whose counsel is requested to furnish the court a form of order consistent with this decision.

### # # #